**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Target Corporation; Shipt, Inc; Dermstore,
LLC; Macy's, Inc.; Macy's Retail Holdings,
LLC;  Macy's Puerto Rico, Inc.; Macys.com,
LLC; Bloomingdale's, LLC;
Bloomingdales.com, LLC; Bluemercury, Inc.;
Macy's Backstage, Inc.; Macy's Credit and
Customer Services, Inc.; Bloomingdale's The
Outlet Store, LLC;  The TJX Companies, Inc.;
Concord Buying Group Inc.; Marshalls of MA,
Inc.; Marshalls of Matteson, IL, Inc.; Marshalls
of Richfield, MN, Inc.; Marshalls of Calumet
City, IL, Inc.; Marshalls of Beacon, VA, Inc.;
Marmaxx Operating Corp.; HomeGoods, LLC;
Marshalls of Laredo, TX, Inc.; Marshalls of
Chicago-Clark, IL, Inc.; Marshalls of CA,
LLC; Marshalls of IL, LLC; T.J. Maxx of CA,
LLC; T.J. Maxx of IL, LLC; Marshalls of
Elizabeth, NJ, Inc.; Marshalls of Glen Burnie,
MD, Inc.; Newton Buying Company of CA,
Inc.; TJX Incentive Sales, Inc.; Derailed, LLC;
New York Department Stores de Puerto Rico,
Inc.; HomeGoods of Puerto Rico, Inc.; TJX
Digital, Inc.; Sierra Trading Post, Inc.; Kohl's
Corporation; Kohl's, Inc.;  Kohl's Value
Services, Inc.; Kohl's Cares, LLC; KIN, Inc.;
KWAL, LLC; Kohl's Michigan, L.P.;  Kohl's
Indiana, Inc; Kohl's Indiana L.P.; Staples, Inc.;
USR Parent Inc.; Office Superstore East LLC;
Staples the Office Superstore, LLC; Staples
Contract & Commercial LLC;  Quill LLC;
Quill Lincolnshire, Inc.; Penney OpCo, LLC;
Office Depot, LLC; Viking Office Products,
Inc.; 4sure.com, Inc.; Computers4sure.com,
Inc.; The Office Club, Inc.;
Solutions4sure.com, Inc.; Bath & Body Works,
Inc.; Henri Bendel, Inc.; Bath & Body Works,
LLC; Bath & Body Works Direct, Inc.;  Puerto
Rico Store Operations, LLC; La Senza Stores,
LLC; Victoria's Secret & Co.; Victoria's
Secret Stores, LLC; VS Direct Fulfillment,
LLC;  VSPR Store Operations, LLC;
OfficeMax, LLC; OfficeMax North America,

Case No. 13-cv-03477-AKH


**THIRD AMENDED AND**
**SUPPLEMENTAL COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Inc.; BizMart, Inc.; BizMart (Texas), Inc.; Big
Lots, Inc.; Big Lots Stores, LLC; Big Lots
Stores – CSR, LLC; Closeout Distribution,
LLC; AVDC, LLC; Big Lots Stores – PNS,
LLC; Abercrombie & Fitch Co.; Abercrombie
& Fitch Stores, Inc.; AFH Puerto Rico, LLC;
Premium Brands Services LLC; Lane Bryant
Brands Opco LLC; Maurices Incorporated;
SFA Holdings Inc.; HBC US Holdings LLC;
Saks & Company LLC; Saks Fifth Avenue
Texas Real Property, LLC; Saks Fifth Avenue
LLC; SCCA Store Holdings Real Property
LLC; Saks Direct, LLC; Saks.com Holdings
LLC; Saks.com LLC; Saks OFF 5TH Holdings
LLC; Saks OFF 5TH LLC; HBC US Propco
Holdings LLC; GHBC City, Inc.; GHBC
Groupe, Inc; Club Libby Lu, Inc.; Lord &
Taylor LLC; Chico's FAS, Inc.; White House
Black Market, Inc.; Soma Intimates, LLC;
Boston Proper, Inc.; EssilorLuxottica USA
Inc.; Luxottica USA LLC; Luxottica of
America Inc.; Rays Houston; LensCrafters
International, Inc.; Air Sun; EYEXAM of
California, Inc.; Sunglass Hut Trading, LLC;
Pearle VisionCare, Inc.; The Optical Shop of
Aspen; MY-OP (NY) LLC; Lunettes, Inc.;
Lunettes California, Inc.; Oliver Peoples, Inc.;
Oakley, Inc.; Oakley Sales Corp.; Oakley Air;
Eye Safety Systems, Inc.; Cole Vision
Services, Inc.; EyeMed Vision Care LLC;
Luxottica North America Distribution LLC;
American Signature, Inc.; and The Door Store,
LLC,

                Plaintiffs,

    v.

Visa Inc.; Visa USA, Inc.; Visa International
Service Association; Mastercard Incorporated;
and Mastercard International Incorporated,

                Defendants.

## THIRD AMENDED AND SUPPLEMENTAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs for their Third Amended and Supplemental Complaint ("Complaint") against Defendants Visa Inc., Visa USA, Inc., Visa International Service Association, Mastercard Incorporated, and Mastercard International Incorporated aver and allege as follows:

## INTRODUCTION

1.      This action is brought against Visa Inc., Visa USA, Inc., and Visa International Service Association (collectively "Visa") and Mastercard Incorporated and Mastercard International Incorporated (collectively "Mastercard").  Visa and Mastercard each has in the past and continues to manage, coordinate, and govern a combination in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1.  Each combination has as its members the overwhelming majority of banks and financial institutions that issue credit and debit cards in the United States.  The vast majority of the banks and financial institutions that are members of Visa are also members of Mastercard, and issue both Visa-branded and Mastercard-branded credit and debit cards.  These issuing banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers.  However, through their membership and agreement to abide by the rules of Visa and Mastercard, each issuing bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

2.      There are two main categories of payment cards: credit (including charge) cards and debit cards.  Credit cards are payment cards that allow consumers to make purchases on credit.  Charge cards are similar to credit cards, but require that the full balance be paid upon receipt of the billing statement.  Debit cards are linked to a consumer's demand deposit account or are prepaid.

3.      Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances.  Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with those accounts.  Banks also earn income on credit and debit cards through the interchange fees paid by merchants.  Interchange fees are imposed on merchants by Visa and Mastercard for the privilege of accepting the issuing bank's card from a consumer as a means of payment, and are collected from the merchant and paid to the issuer of the card.  The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.  Credit and debit cards are among the most profitable portions of the issuing banks' businesses, generating significant revenue through high interest rates, fees, and other ancillary products.

4.      Banks issuing credit and debit cards compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants.  Issuing banks that are members of Visa and Mastercard compete with each other in the issuance of credit and debit cards to consumers.  For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

5.      Visa and Mastercard have adopted nearly identical rules, which are agreed to by their member banks and imposed on merchants that accept cards issued by those banks.  These rules, or Competitive Restraints, eliminate competition among their member issuing banks for merchant acceptance of credit cards and merchant acceptance of debit cards.  As a consequence of

Visa and Mastercard each having as members nearly all card issuing banks in the United States, and as a consequence of those card issuing banks having agreed to rules that preclude them from independently competing for merchant acceptance, Visa and Mastercard and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in the United States.  The exercise of this market power has led merchants to pay excessive interchange and network fees, injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare. Excessive interchange and network fees also lead to lower merchant acceptance of credit and debit cards.  The competitive harm caused by the excessive interchange and network fees has not been offset by benefits received by cardholders.  Indeed, in May 2013, Visa CEO Charles W. Scharf admitted that Visa's rules "stood in the way of [banks] working together to do something positive for the merchant."  Both Visa's and Mastercard's rules equally bar issuing banks from doing "something positive" for cardholders, who would have benefitted from banks competing for their business by differentiating their offerings, including by offering discounts and other benefits at the point of sale, through direct deals with merchants.  In this manner, Visa and Mastercard have unlawfully restrained and continue to unlawfully restrain competition in these markets.

6.    Among the principal rules, regulations, and practices that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the No Discount Rules, the No Surcharge Rules, the Anti-Discrimination Rules, and the All Outlets Rules and contractual restraints.  In addition, the Competitive Restraints include rules through which Visa and Mastercard have suppressed competition for the provision of network services, such as their No Competing Marks Rules and Visa's No Bypass Rules.  These rules, regulations, and practices, individually and in combination, preclude merchants from gaining the benefits of

competition as to the terms, including fees (if any), for the acceptance of cards of particular issuing banks and preclude card issuing banks from competing for merchant acceptance of their cards. As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supracompetitive level. Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and Mastercard-branded credit and debit cards than they would if the banks issuing such cards competed for merchant acceptance, injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

7.      Because of their participation in the Competitive Restraints through their membership in Visa and Mastercard, issuing banks do not compete for transaction volume by independently competing for merchant acceptance. The Competitive Restraints have ensured that issuing banks have not competed on the basis of differentiating their offerings to cardholders through direct deals with merchants that would have enabled such differentiation at the point of sale. Competition also would have enabled issuing banks to differentiate their products from competing issuing banks' products by providing cardholders, ███████████████████ ████████████████████████████████████████████████████ c████████████████████████████████████████ Cardholders (and other consumers) have paid higher prices and received less choice and innovation as a result.

8.      Visa and Mastercard, on behalf of their member issuing banks, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange issuing banks are able to obtain from merchants. While Visa and Mastercard nominally refer to these schedules as "default" interchange fee schedules, suggesting it is possible for issuing banks and merchants to gain different interchange rates by entering into acceptance

agreements between merchants and individual issuing banks, the Competitive Restraints impede such agreements. The Competitive Restraints also eliminate incentives for Visa and Mastercard to compete for merchant acceptance through setting low "default" interchange fees. By setting and enforcing supracompetitive interchange fees applicable to all merchants that accept cards issued by their members, Visa and Mastercard act as agents of their members for the purposes of exercising the market power gained by their combinations. Further, the processes through which Visa and Mastercard have set default interchange fees have exploited the market power of Visa, Mastercard, and their members.

9.      For more than a decade, judicial efforts to curb the exercise of market power by the Visa and Mastercard combinations have been ineffective. In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on the American Express or Discover networks, were declared unlawful. In that same year, in a class action settlement, Visa and Mastercard agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance. Those actions did not diminish Visa's and Mastercard's power to dictate price and prevent competition. Immediately after those actions, both combinations increased the credit card interchange fees extracted from merchants, and used their market power to require merchants to accept rewards and commercial cards in order to accept basic credit cards. The debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

10.      In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards. Two years later, in a settlement with the Department of Justice, the Visa and Mastercard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed.

These changes did not diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants.  Instead, interchange fees continue to increase.

11.    In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o–2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates often comparable to credit interchange rates) and PIN debit interchange.  This maximum fee was set significantly below the then-existing interchange fee levels set by Visa and Mastercard for debit card transactions.  The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by small banks, nor did it apply to credit cards.  The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.

12.    If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks, acquiring banks, and merchants would operate in competitive markets for merchant acceptance of credit cards and of debit cards and merchants would benefit from competition among issuing banks as to interchange fees.  Collectively set interchange fees do not protect merchants such as Plaintiffs, but rather allow issuing banks to charge interchange fees far in excess of the issuing banks' costs.  In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiffs would be substantially below the amounts they have paid since January 1, 2004.  If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuing banks, they would induce competition among issuing banks that would lead to lower interchange fees.  Further, in the absence of "default" interchange fees and the Competitive Restraints, incentives for issuing banks to compete vigorously for cardholders would increase, and cardholders would continue to

receive rewards or comparable benefits from issuing banks, which would seek to ensure that they continue to benefit from the profitability of their card businesses.

13.      Plaintiffs collectively paid more than $1 billion in their last fiscal year in credit and debit interchange fees to issuing banks that are members of Visa and Mastercard.  Interchange fees are generally one of a merchant's largest operating expense items.  Elimination of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiffs to operate more efficiently and at lower costs, to the benefit of consumers.  Plaintiffs operate in intensely competitive markets and would use the savings from a reduction in their interchange costs to increase their competitiveness by enhancing the value their customers receive.  In a market in which the structure and funding of incentives were not determined by agreement among the members of Visa and Mastercard, rewards would continue to be offered, given the profitability of cardholder issuances and usage to issuing banks. Individual issuing banks nevertheless would have incentives to differentiate their products and fund rewards or other features of equal or greater benefit to cardholders, given the significant revenue issuing banks earn from card issuances and the loans generated by those cards.

## JURISDICTION AND VENUE

14.      The United States District Court for the Southern District of New York has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

15.      Venue is proper in the United States District Court for the Southern District of New York because Defendants reside in, are found in, have agents in, and transact business in the

Southern District of New York as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

16.    The United States District Court for the Southern District of New York has personal jurisdiction over Defendants because, inter alia, they: (a) transacted business throughout the United States, including in the Southern District of New York; (b) had substantial contacts with the United States, including in the Southern District of New York; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the Southern District of New York.

## DEFINITIONS

17.    For purposes of this Complaint, the following definitions apply.

18.    "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards.  The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant.  (While commonly referred to as "payment cards," from an issuing bank's perspective, credit cards are simply a vehicle for granting consumers access to unsecured lines of credit.  For issuing banks, credit cards are means that banks provide for their account customers to access their lines of credit.  Widespread merchant acceptance of those cards is crucial to the value of the credit account for both the cardholder and the issuing bank.)  Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder.  Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer.  Credit card issuing banks compete

for consumers by offering a variety of terms and types of cards, which vary by level of rewards that are intended to induce consumers to use their cards. Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no corresponding benefits to merchants. Credit cards, as the term is used in this Complaint, include charge cards, which allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance. Unlike charge cards, such as those issued by American Express, that generate revenue for the vertically integrated issuer primarily from fees charged to merchants, credit cards generate revenue primarily from a variety of fees and interest charged to cardholders by issuing banks.

19.     "Debit cards" are payment cards that allow holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts. They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card. (While commonly referred to as "payment cards," from an issuing bank's perspective, debit cards are simply a vehicle for granting consumers access to funds in their demand deposit account. For issuing banks, debit cards are means that banks provide for their account customers to access their checking account. Widespread merchant acceptance of those cards is crucial to the value of the demand deposit account for both the cardholder and the issuing bank.) There are two methods of authenticating debit cards. PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder. Signature debit cards usually require the cardholder's signature at the time of the transaction. In the past, some PIN debit cards did not carry interchange fees or were subject to reverse interchange — where the merchant received a fee for card acceptance. Signature debit cards generally carried higher interchange fees, some of which equaled the interchange fees charged for credit card transactions. In 2011, pursuant to the

Durbin Amendment, Federal Reserve Board regulations set the maximum interchange fee for regulated issuing banks at $.21 plus 0.05% (plus an additional $.01 for fraud prevention for eligible issuing banks), or an average of $.23-.24 per debit transaction. In contrast, the signature debit interchange fees previously set by Visa and Mastercard averaged $.58 and $.59, respectively, for the same issuing banks.

20. An "issuing bank" is a member of Visa or Mastercard that issues general purpose credit or debit cards to cardholders. The majority of issuing banks are members of both Visa and Mastercard and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders. However, such competition is limited by the issuing banks' membership in Visa and Mastercard.

21. An "acquiring bank" is a member of Visa or Mastercard that acquires purchase transactions from merchants. All acquiring banks are members of Visa and Mastercard. As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or Mastercard networks, that interchange fees set by Visa and Mastercard are paid on all transactions, and that merchants abide by the rules imposed by Visa and Mastercard. Acquiring banks compete with one another for the acquisition business of merchants within the limited scope of competition allowed by Visa's and Mastercard's Competitive Restraints and practices.

22. A "processor" is an entity that a merchant contracts with to handle credit and debit card transactions on behalf of an acquiring bank, including both front-end and back-end processing functions. Front-end processing functions are the functions that connect card networks, and supply authorization, clearance, and settlement services to merchants. Back-end processing functions are the functions that reconcile transactions from merchants' front-end processors and that allow for the movement of funds from the issuing bank to the merchant's bank.

23.    "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and Mastercard have delegated to the networks to provide on the members' behalf.  Authorization, clearance, and settlement refers to the process by which payment card transactions are completed.

24.    "Network fees" are fees assessed by Defendants on merchants as a condition of their acceptance of Defendants' branded cards and include, but are not limited to, assessment fees, acquirer processing fees, the Transaction Integrity Fee, and other network access fees.

25.    "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Visa or Mastercard combinations. Under the agreements by and among Visa and its member banks and Mastercard and its member banks, the so-called "default" interchange fees are set by Visa and Mastercard, respectively, and the merchants' payment of interchange and compliance with other rules are enforced through the acquiring banks.

26.    "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fees and network fees paid by merchants.

**THE PARTIES**

**PLAINTIFFS**

27.    Plaintiff Target Corporation is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Target, through and with its subsidiary Shipt, Inc., and from 2013 through 2021, its subsidiary Dermstore, LLC (collectively "Target"), operates more than 1,950 retail stores throughout the United States and also engages in internet sales via target.com

and, from 2013 to 2021, via dermstore.com.  Target had more than $105 billion in retail sales in

2023.  Target accepts both Visa and Mastercard debit and credit cards for payment in its stores and

online.  Accordingly, Target has been forced to pay Defendants' supracompetitive interchange fees

and to abide by Defendants' Competitive Restraints.  Target, therefore, has been and will be injured

in its business or property as a result of the unlawful conduct alleged herein.

28.    Plaintiff Macy's, Inc. is a Delaware corporation with its principal place of business

in New York, New York.  Macy's, Inc. is an omnichannel retailer with fiscal 2023 sales of over

$23 billion.  Macy's, Inc., through its subsidiaries Macy's Retail Holdings, LLC (f/k/a Macy's

Retail Holdings, Inc. and successor-in-interest to Macy's West Stores, LLC  and Macy's Florida

Stores, LLC), Macy's Puerto Rico, Inc., Macys.com, LLC (f/k/a Macys.com Inc.),

Bloomingdale's, LLC (f/k/a Bloomingdale's, Inc.), Bloomingdales.com, LLC (f/k/a

Bloomingdale's By Mail, Ltd.), Bluemercury, Inc., Macy's Backstage, Inc., Macy's Credit and

Customer Services, Inc., and Bloomingdale's The Outlet Store, LLC (f/k/a Bloomingdale's The

Outlet Store, Inc.) (collectively "Macy's"), operates the Macy's, Bluemercury, and

Bloomingdale's brands with over 700 stores in 45 states, the District of Columbia, Guam, and

Puerto Rico, under the names of Macy's, Bloomingdale's, and Bluemercury; and the macys.com,

bluemercury.com, and bloomingdales.com websites.  Macy's accepts credit cards and debit cards

for payment in its stores and online, including both Visa and Mastercard debit and credit

cards.  Accordingly, Macy's has been forced to pay Defendants' supracompetitive interchange fees

and to abide by Defendants' Competitive Restraints.  Macy's, therefore, has been and will be

injured in its business or property as a result of the unlawful conduct alleged herein.

29.    Plaintiff The TJX Companies, Inc. is a Delaware corporation with its principal

place of business in Framingham, Massachusetts.  The TJX Companies, Inc. is a global off-price

apparel and home fashions retailer with approximately $42.2 billion in net sales in the United States in the fiscal year ending February 3, 2024. The TJX Companies, Inc., on its own behalf and through its subsidiaries Concord Buying Group Inc.; Marshalls of MA, Inc.; Marshalls of Matteson, IL, Inc.; Marshalls of Richfield, MN, Inc.; Marshalls of Calumet City, IL, Inc.; Marshalls of Beacon, VA, Inc.; Marmaxx Operating Corp.; HomeGoods, LLC (f/k/a HomeGoods, Inc.); Marshalls of Laredo, TX, Inc.; Marshalls of Chicago-Clark, IL, Inc.; Marshalls of CA, LLC; Marshalls of IL, LLC; T.J. Maxx of CA, LLC; T.J. Maxx of IL, LLC; Marshalls of Elizabeth, NJ, Inc.; Marshalls of Glen Burnie, MD, Inc.; Newton Buying Company of CA, Inc.; TJX Incentive Sales, Inc.; Derailed, LLC; New York Department Stores de Puerto Rico, Inc.; HomeGoods of Puerto Rico, Inc.; TJX Digital, Inc.; and Sierra Trading Post, Inc. (collectively "TJX"), operates more than 3,585 Marshalls, T.J. Maxx, HomeGoods, HomeSense, and Sierra stores in the United States. TJX accepts both Visa and Mastercard debit and credit cards for payment in its stores, online, and for catalog sales currently made primarily through Sierra. Accordingly, TJX has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. TJX, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

30.    Plaintiff Kohl's Corporation is a Wisconsin corporation with its principal place of business in Menomonee Falls, Wisconsin. Kohl's Corporation, through its subsidiaries Kohl's, Inc. (f/k/a Kohl's Department Stores, Inc.), Kohl's Value Services, Inc., Kohl's Cares, LLC, KIN, Inc. (f/k/a Kohl's, Inc. and Kohl's Illinois, Inc.), KWAL, LLC, Kohl's Michigan, L.P., Kohl's Indiana, Inc., and Kohl's Indiana L.P. (collectively "Kohl's"), operates more than 1,170 Kohl's stores in 49 states. It also engages in internet sales. In fiscal year 2023, Kohl's had sales of more than $16.5 billion. Kohl's accepts both Visa and Mastercard debit and credit cards for payment in

its stores and online.  Accordingly, Kohl's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Kohl's, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

31.    Plaintiffs Staples, Inc. and USR Parent Inc. are Delaware corporations with their principal places of business in Framingham, Massachusetts.  Staples, Inc. and USR Parent Inc., through and with their subsidiaries Office Superstore East LLC (f/k/a Staples the Office Superstore East, Inc.), Staples the Office Superstore, LLC, Staples Contract & Commercial LLC (f/k/a Staples Contract & Commercial, Inc.) (into which LoneSource, Inc. was merged following its acquisition in 2013; Capital Office Products of Volusia County, Inc. was merged following its acquisition in 2016; Compudata Products, Inc. was merged following its acquisition in 2018; and which also acquired the assets of MFL Distributing, Inc. in 2014 and Gulf Coast Office Products, Inc. in 2017), Quill LLC (f/k/a Quill Corporation) (into which Medical Arts Press, Inc. was merged following its acquisition in or about 2015), and Quill Lincolnshire, Inc. (collectively "Staples"), operate approximately 960 stores in the United States and also are engaged in e-commerce and delivery sales.  Staples is privately held and does not report its income.  Staples accepts both Visa and Mastercard debit and credit cards for payment in its retail, online, and delivery channels.  Accordingly, Staples has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Staples, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

32.    Plaintiff Penney OpCo, LLC ("JCPenney") is a Virginia limited liability company with its principal place of business in Plano, Texas.  JCPenney acquired plaintiff J.C. Penney Corporation, Inc. in 2020.  JCPenney had net sales of $7.2 billion in the fiscal year ended 2023. JCPenney operates approximately 650 stores in the United States and Puerto Rico, engages in e-

commerce, and during part of the relevant time period, also engaged in a significant catalog business. JCPenney accepts both Visa and Mastercard credit and debit cards for payment in its stores, online, and in its catalog business. Accordingly, JCPenney has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. JCPenney, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

33.    Plaintiff Office Depot, LLC (f/k/a Office Depot, Inc.), is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. Office Depot, LLC, through and with its subsidiaries Viking Office Products, Inc., 4sure.com, Inc., Computers4sure.com, Inc., The Office Club, Inc., and Solutions4sure.com, Inc. (collectively "Office Depot") is a supplier of office supplies and services with over $3.8 billion in sales in fiscal 2023. Office Depot operates approximately 916 retail stores and also engages in internet sales. Office Depot accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Office Depot has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Office Depot, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

34.    Plaintiff Bath & Body Works, Inc. (f/k/a L Brands, Inc. and Limited Brands, Inc.) is a Delaware corporation with its principal place of business in Columbus, Ohio. Bath & Body Works, Inc., through its subsidiaries Henri Bendel, Inc., Bath & Body Works, LLC, Bath & Body Works Direct, Inc. ("BBWD"), Puerto Rico Store Operations, LLC, and La Senza Stores, LLC (the La Senza brand was sold in December 2018) (collectively "BBW"), is a specialty retailer of home fragrance, body care, soap, and sanitizer products. BBW operates more than 1,730 specialty

retail stores in the United States, and through BBWD, engages in internet sales within the United States.  In fiscal 2023, BBW had more than $7.4 billion in global net sales.  BBW accepts both Visa and Mastercard debit and credit cards for payment in its stores, online, and through catalog purchases.  Accordingly, BBW has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  BBW, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

      a.      Plaintiff Victoria's Secret & Co. is a Delaware corporation with its principal place of business in Reynoldsburg, Ohio.  On August 2, 2021, Victoria's Secret & Co. was separated from plaintiff L Brands, Inc. in accordance with the terms of a Separation and Distribution Agreement and became an independent, publicly traded company. Victoria's Secret & Co., through its subsidiaries Victoria's Secret Stores, LLC, ("VSS"), VS Direct Fulfillment, LLC (f/k/a L Brands Direct Fulfillment, LLC) ("VSD"), and VSPR Store Operations, LLC (collectively "Victoria's Secret"), is a specialty retailer of women's intimate and other apparel and beauty products.  (Until August 2, 2021, VSS and VSD were subsidiaries of plaintiff L Brands, Inc.)  Victoria's Secret engages in retail and e-commerce sales and operates more than 800 stores in the United States and, in fiscal year 2023, had global net sales over $6 billion.  Victoria's Secret accepts both Visa and Mastercard debit and credit cards for payment in its stores and online.  Accordingly, Victoria's Secret has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Victoria's Secret therefore has and will be injured in its business or property as a result of the unlawful conduct alleged herein.

35.    Plaintiff OfficeMax, LLC (f/k/a OfficeMax Incorporated) is a North Carolina limited liability company that, until early 2014, had its principal place of business in Naperville, Illinois, and since then has had its principal place of business in Boca Raton, Florida.  OfficeMax, LLC, with and through its subsidiaries OfficeMax North America, Inc., BizMart, Inc., and BizMart (Texas), Inc. (collectively "OfficeMax") provides products, solutions, and services for the workplace, whether for business or at home.   In fiscal 2012, OfficeMax had net sales of approximately $6.9 billion.  OfficeMax accepts, inter alia, both Visa and Mastercard credit and debit cards for payment.   Accordingly, OfficeMax has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. OfficeMax, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

36.    On November 5, 2013, Office Depot and OfficeMax completed a merger in an all-stock transaction.

37.    Plaintiff Big Lots, Inc., is an Ohio Corporation with its principal place of business in Columbus, Ohio.  Big Lots, Inc., through its subsidiaries  Big Lots Stores, LLC (f/k/a Big Lots Stores, Inc.), Big Lots Stores – CSR, LLC (f/k/a C.S. Ross Company), Closeout Distribution, LLC (f/k/a Closeout Distribution, Inc.), AVDC, LLC (formerly AVDC, Inc.), and Big Lots Stores – PNS, LLC (f/k/a PNS Stores, Inc.) (collectively "Big Lots")[1] has operated up to 1,400 stores in 48 states.  In fiscal year 2023, Big Lots had net sales of $4.7 billion.  Big Lots accepts both Visa and Mastercard debit and credit cards for payment in its stores and through internet sales.  Accordingly, Big Lots has been forced to pay Defendants' supracompetitive interchange fees and to abide by

---

[1] Big Lots Stores, LLC, Big Lots Stores – CSR, LLC, Closeout Distribution, LLC, AVDC, LLC, and Big Lots Stores – PNS, LLC became subsidiaries of Big Lots, Inc as part of a 2020 corporate reorganization.

Defendants' Competitive Restraints. Big Lots, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

38.    Plaintiff Abercrombie & Fitch Co. is a Delaware corporation with its principal place of business in New Albany, Ohio. Abercrombie & Fitch Co., through its subsidiaries Abercrombie & Fitch Stores, Inc. (into which J.M. Hollister, LLC, RUEHL No. 925, and Gilly Hicks, LLC merged in 2020) and AFH Puerto Rico, LLC (collectively "Abercrombie & Fitch"), sells clothing and accessories at more than 900 retail stores in the United States and also engages in internet sales. Abercrombie & Fitch had global net sales of approximately $4.23 billion in fiscal 2023. Abercrombie & Fitch accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Abercrombie & Fitch has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Abercrombie & Fitch, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

39.    Plaintiffs Premium Brands Services LLC and Lane Bryant Brands Opco LLC (f/k/a Ascena Retail Group, Inc.) are Ohio limited liability companies with their principal places of business in Mahwah, New Jersey and New Albany, Ohio, respectively. Premium Brands Services LLC and Lane Bryant Brands Opco LLC are specialty retailers that offer or have offered clothing, shoes, and accessories for women through their Lane Bryant, Cacique, Maurices, dressbarn, and Catherine brands; for tween girls and boys through their Justice and Brothers brands, and specialty items through their Figi's, Inc. brand (collectively "Ascena"). Ascena engages in sales via brick-and-mortar stores and e-commerce in the United States and Puerto Rico. Ascena is privately held and does not report its income. Ascena accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Ascena has been forced to pay Defendants'

supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Ascena therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

    a.    Plaintiff Maurices Incorporated ("Maurices") is a Delaware corporation with its principal place of business in Duluth, Minnesota. Maurices is a specialty retailer selling women's clothing, shoes, and accessories through its maurices brand in 831 retail stores in the United States and on its e-commerce website. (Maurices Incorporated was previously a subsidiary of plaintiff Ascena Retail Group, Inc.) In fiscal year 2024, Maurices had net retail sales over $926 million. Maurices accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Maurices has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Maurices therefore has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

    40.    Plaintiffs SFA Holdings Inc. (f/k/a Saks Incorporated) and HBC US Holdings LLC, are, respectively, Tennessee and Delaware corporations, with their principal places of business in New York, New York. SFA Holdings Inc. and HBC US Holdings LLC, through their subsidiaries Saks & Company LLC (into which Saks Fifth Avenue Texas, LLC and SCCA Store Holdings, Inc. have merged); Saks Fifth Avenue Texas Real Property, LLC; Saks Fifth Avenue LLC (f/k/a Saks Fifth Avenue, Inc.); SCCA Store Holdings Real Property LLC; Saks Direct, LLC; Saks.com Holdings LLC; Saks.com LLC; Saks OFF 5TH Holdings LLC; Saks OFF 5TH LLC; HBC US Propco Holdings LLC (f/k/a Lord & Taylor Holdings LLC); GHBC City, Inc.; GHBC Groupe, Inc; and Club Libby Lu, Inc. (collectively "Saks"), operate approximately 35 Saks Fifth Avenue

and 83 Saks OFF 5th retail stores in the United States and also engage in internet sales. Saks's annual net sales exceed $3 billion. Saks accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Saks has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Saks, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

41.     Plaintiff Lord & Taylor LLC is a Delaware limited liability company with its principal place of business in New York, New York. Lord & Taylor is a retail department store chain that offers clothing, shoes, jewelry, beauty products, fragrances, electronics, bedding, and housewares. Lord & Taylor operates more than 50 stores in the U.S. and also engages in internet sales. Lord & Taylor's annual net sales exceed $1.3 billion. Lord & Taylor accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Lord & Taylor has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Lord & Taylor, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

42.     [RESERVED.]

43.     Plaintiff Chico's FAS, Inc. is a Florida corporation with its principal place of business in Fort Myers, Florida. Chico's FAS, Inc. is a specialty retailer of women's apparel. Chico's FAS, Inc., on its own behalf and through its subsidiaries White House Black Market, Inc., Soma Intimates, LLC, and Boston Proper, Inc. (collectively "Chico's"), operates[2] more than 1,250 stores in 46 states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico. It also engages in internet and catalog sales. Chico's had net sales of more than $2.1 billion in fiscal year

---

[2] On January 15, 2016, Chico's FAS, Inc. sold the Boston Proper brand.

2022. Chico's accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, Chico's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Chico's, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

44. Plaintiff EssilorLuxottica USA Inc. (f/k/a Luxottica U.S. Holdings Corp.) is a Delaware corporation with its principal place of business in Port Washington, New York. EssilorLuxottica USA Inc. and its direct and indirect subsidiaries and affiliates Luxottica USA LLC; Luxottica of America Inc. (f/k/a Luxottica Retail North America Inc.); Rays Houston; LensCrafters International, Inc.; Air Sun; EYEXAM of California, Inc.; Sunglass Hut Trading, LLC; Pearle VisionCare, Inc.; The Optical Shop of Aspen; MY-OP (NY) LLC; Lunettes, Inc.; Lunettes California, Inc.; Oliver Peoples, Inc.; Oakley, Inc.; Oakley Sales Corp.; Oakley Air; Eye Safety Systems, Inc.; Cole Vision Services, Inc.; EyeMed Vision Care LLC; and Luxottica North America Distribution LLC (collectively "Luxottica") are wholesalers and retailers of iconic sun and prescription eyewear, among other activities, and operate more than 4,000 retail stores in the United States, including LensCrafters, Pearle Vision, Sunglass Hut, and Oakley. Luxottica's net sales in fiscal 2023 were not reported publicly. Luxottica accepts both Visa and Mastercard debit and credit cards for payment. Accordingly, Luxottica has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Luxottica, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

45. Plaintiff American Signature, Inc. and its subsidiary The Door Store, LLC (collectively "American Signature") are privately held companies with their principal place of business in Columbus, Ohio. American Signature operates approximately 123 American Signature

Furniture and Value City Furniture stores in the United States. Plaintiff The Door Store, LLC ceased operating stores in 2011 and was dissolved in 2019. American Signature is privately held and does not report its income. American Signature accepts both Visa and Mastercard debit and credit cards for payment in its stores and online. Accordingly, American Signature has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. American Signature, therefore, has been and will be injured in its business or property as a result of the unlawful conduct alleged herein.

46.    Plaintiffs timely opted out of the Rule 23(b)(3) settlement class preliminarily approved by the court on November 28, 2012 in the case captioned: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720-JG-JO, United States District Court for the Eastern District of New York (the "Class Action Settlement"), but nevertheless were enjoined by the terms of the Class Action Settlement and the November 28, 2012, December 13, 2013, and January 14, 2014 Orders from pursuing claims arising after November 28, 2012. On June 30, 2016, the United States Court of Appeals for the Second Circuit reversed the final approval order and vacated the Class Action Settlement. The mandate of the Second Circuit issued on July 29, 2016 thereby vacated the injunction that had prevented Plaintiffs from pleading fully their claims and demands for relief.

## DEFENDANTS

47.    Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa USA, Inc. was a group-member of Visa International Service Association and was also a non-stock Delaware corporation. Visa USA, Inc. had its principal place of business in San Francisco, California. Visa USA, Inc.'s

members were the banks and financial institutions acting as issuing banks and acquiring banks in the Visa system.

48.    Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Visa Inc. was created through a corporate reorganization in or around October 2007.  Visa USA, Inc.'s member banks and financial institutions were among the initial shareholders of Visa Inc.

49.    Defendants Visa Inc., Visa USA, Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

50.    Defendant Mastercard Incorporated was incorporated as a Delaware stock corporation in May 2001.  Its principal place of business is in Purchase, New York.

51.    Defendant Mastercard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its bank and financial institution issuing banks and acquiring banks.  Prior to the initial public offering described below, Mastercard International Incorporated was the principal operating subsidiary of Mastercard Incorporated.

52.    Defendants Mastercard International Incorporated and Mastercard Incorporated are referred to collectively as "Mastercard" in this Complaint.

## ALLEGATIONS

## THE PAYMENT CARD INDUSTRY IN GENERAL

53.    The payment card industry involves two categories of general purpose payment cards:  (1) credit (including charge) cards and (2) debit (including prepaid) cards.  As explained more fully below, credit cards constitute a separate product market from debit cards.

54.    Credit cards are extremely profitable to issuing banks.  Issuing banks earn income when card users select and use their cards and when merchants accept their cards.  Issuing banks

are paid interchange fees by merchants at the time a transaction is settled. Interchange is only one source of revenue for issuing banks, however. The largest source of revenue for card issuers is interest on card balances maintained by cardholders. Interest rates on unpaid credit card balances are among the highest interest rates charged for consumer lending transactions, even for extremely credit-worthy borrowers. In addition, card issuers are paid fees by cardholders, including annual fees, late fees, over credit limit fees, bad check fees, cash advance transaction fees, foreign exchange fees, and fees for optional protection programs such as insurance.

55.    Merchants, including each Plaintiff, are responsible to pay, and do pay, interchange fees to issuing banks. Interchange fees are set based upon the type, size, and identity of the merchant, not the acquiring bank. Acquiring banks do not pay interchange fees. Visa acknowledges that merchants pay interchange fees, either bundled with the merchant discount rate or as a separately delineated component. Mastercard has explicitly acknowledged the same:

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████    Likewise, in its filings with the Securities and Exchange Commission, Mastercard has stated that "[i]nterchange fees … are generally the largest component of the costs that merchants pay to accept cards." Visa and Mastercard routinely review and analyze the interchange fees paid by merchants.

56.    Visa and Mastercard operate what is commonly referred to as a four-party, or "open loop," system. Visa and Mastercard do not issue credit cards to cardholders or have a direct relationship with cardholders. Rather, Visa and Mastercard facilitate a combination of issuing banks that have direct relationships with cardholders. Issuing banks, through their membership in

Visa and Mastercard, avoid having to negotiate and compete for merchant acceptance individually, while still being guaranteed interchange revenue at the rate set by Visa and Mastercard.

57.    Other card networks, such as American Express, traditionally operated a three-party, or "closed-loop," system, which is a simpler system than the four-party systems operated by Visa and Mastercard.  For example, in a three party system, the network issues credit cards directly to cardholders and has a direct relationship with cardholders.  Further, in such a system the network negotiates directly with merchants, including with respect to pricing, rather than collectively establishing a default interchange rate for issuing banks that merchants are required to pay.

58.    Issuing banks compete to have cardholders carry and use payment cards that they issue within parameters limited by the anticompetitive conduct at issue in this case.  By agreeing to the Competitive Restraints, issuing banks have agreed not to compete among themselves for merchant acceptance of payment cards.

59.    Credit cards (other than charge cards) permit consumers to borrow the money for a purchase from the card issuer and to repay that debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuing bank.  Charge cards provide an interest-free loan during a grace period.

60.    Issuing banks have the ability to compete for cardholders and card usage by offering credit card products with a variety of features such as cash back rebates, introductory interest rates, and reduced fees.

61.    Cards that offer cash-back, airline miles, or other usage benefits are often referred to as "rewards cards."  Those rewards cards that offer the highest levels of rewards are referred to as "premium cards" and include cards such as Visa Signature Preferred and Mastercard World Elite.  Standard or "traditional" credit cards, which do not offer the same array of features to

cardholders, include products such as Visa Traditional and the Mastercard Core Value cards. Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions. Rewards cards are extremely profitable to issuing banks, increasing issuing banks' profits by up to ████ over non-rewards cards.

62.    Visa and Mastercard attempt to justify charging merchants such as Plaintiffs higher interchange fees on rewards cards, including premium rewards cards, arguing that rewards cardholders spend more than they would have if they were not using rewards cards. In fact, merchants such as Plaintiffs receive no additional benefits from the higher interchange fees they must pay on transactions in which those rewards cards are used. Nevertheless, merchants do not have the ability to refuse to accept rewards cards under Visa's and Mastercard's Competitive Restraints without refusing to accept all Visa-branded or Mastercard-branded cards.

63.    In order to assist issuing banks to achieve additional interchange revenues, Visa and Mastercard have encouraged and enabled their issuing banks to upgrade or graduate large groups of their cardholders to rewards cards or premium rewards cards that carry higher interchange, often without the cardholders' prior knowledge or consent. In many cases, cardholders are upgraded or graduated to a higher level card based on the cardholder's past spending history. Thus, the merchants at which these graduated cardholders shop are required to pay more in interchange fees even though nothing about the cardholders or their spending habits has changed.

64.    In the absence of the Competitive Restraints, and "default" interchange that is set at levels to transfer the cost of rewards to merchants, issuing banks would seek to differentiate their products to compete for the significant income generated by cardholder issuances and usage

in order to maintain the significant financial benefits the issuing banks receive from card issuances and usage. As much as ███ of issuing bank revenue on card portfolios comes from interest on revolving balances and fees such as annual fees, over limit fees, late fees, bad check fees, cash advance transaction fees, foreign exchange fees, and fees for optional protection programs such as insurance. Issuing banks could use these significant sources of revenue to fund cardholder rewards, even with reduced or no interchange fee income.

65.    Cardholders who do not qualify for or who choose not to apply for rewards or premium cards do not benefit from the rewards offered by issuing banks, and suffer from the additional costs imposed on merchants by Visa's and Mastercard's "default" interchange rates for such cards.

66.    Issuing banks also issue to individuals and businesses commercial cards, which carry higher interchange fees similar to those for premium rewards cards. Merchants such as Plaintiffs receive no additional benefits from the higher interchange fees they must pay on transactions in which those commercial cards are used. Nevertheless, merchants do not have the ability to refuse to accept commercial cards.

67.    The interchange fees generated by rewards cards exceed the costs of funding the rewards for those cards. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████

68.    Rewards cards and commercial cards do not increase the overall amounts individual consumers spend at a merchant.  Rather, they tend to drive consumers to shift the amount they would otherwise spend using a lower cost form of payment (cash, debit cards, or non-rewards credit cards) to the higher cost form of payment (rewards and commercial cards).

69.    Neither Visa nor Mastercard has rules or policies that provide meaningful protection for cardholders from abuse by issuing banks seeking to further increase their already supracompetitive revenues. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

70.    Because the card portfolios are a major profit center for issuing banks, they have significant incentive to disregard the rights of cardholders in their issuance and sales practices.  In recent years, the financial incentive for banks to maximize such revenue has been demonstrated by the fact that certain issuing banks have repeatedly violated the Consumer Financial Protection Act of 2010 ("CFPA") in their desire to squeeze even greater revenue from the fees, interest, and other income that new cardholders bring with them, especially those who revolve their credit card balances each month, resulting in significant interest paid to the issuing banks.  J.P. Morgan Chase, Citibank, and Bank of America have all entered into consent orders requiring the payment of

significant fines and restitution for violations of the CFPA. The repeated violations of the CFPA by major issuing banks demonstrate the lengths to which issuing banks will go to gain revenue from cardholders.

71.      The recently disclosed actions of Wells Fargo also demonstrate the lengths to which issuing banks will go to gain revenue from card issuance and depository accounts. The Consumer Financial Protection Bureau found that between 2011 and 2015 Wells Fargo, a member of both Visa and Mastercard, opened more than 565,000 Visa- and Mastercard-branded credit cards without consent from the named cardholder. These events, which were induced by the bank's existing compensation and bonus systems and employee quotas for new issuances, confirm the profitability of card issuances. However, upon information and belief, Visa and Mastercard have not taken any steps to prevent Wells Fargo or other issuing banks from further misconduct or to protect their brands from misuse by Wells Fargo or other issuing banks.

72.      Debit cards are one means for demand deposit account holders to access the money in their accounts. Pre-paid debit cards allow cardholders to access the funds either deposited on the card when it was purchased or later loaded onto the card. There are two primary forms of authentication used for debit cards in the United States. One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction. The other is PIN-based, in which the cardholder enters a four-digit PIN to authenticate the cardholder.

73.      Debit cards, and the deposit accounts to which they are tied, bring significant revenue and other value to issuing banks. In addition to the interchange fees that merchants pay on debit card transactions, issuing banks also reap revenues from overdraft and other fees paid by cardholders and net interest income on deposit account balances. In light of the ubiquity of debit cards, issuing banks must have the ability to offer debit cards in order to attract consumers to

deposit funds.  Additionally, the use of debit cards to access deposit accounts saves issuing banks money because debit transactions are less costly than check transactions for the issuing banks.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

74.    Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences underlay the court's determination in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## THE COMBINATIONS

75.    Visa and Mastercard until recently were organized as joint ventures of their member issuing banks and acquiring banks.  As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and Mastercard-branded cards.  Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting Visa-branded and Mastercard-branded cards.  "Default" interchange fee rates are set by Visa and Mastercard for the benefit of their member issuing banks.

76.    As a result of the Competitive Restraints, the "default" interchange fees are made binding and bilateral negotiation of interchange fees between merchants and individual issuing

banks does not occur.  This is by design.  Both Visa and Mastercard have vigorously avoided a system in which true bilateral negotiations of interchange fees – i.e., true competition among issuing banks – are the norm. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

77.     Through these joint ventures, Visa, Mastercard, and their respective issuing banks collectively have gained market power in the payment card industry.  Visa and Mastercard each have thousands of issuing bank members in the United States, and there is significant overlap between these banks because, as Mastercard states in its most recent 10-K, "financial institutions typically issue both Mastercard and Visa-branded payment products."  The Competitive Restraints have eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank.  These Competitive Restraints have eliminated the development of competitive markets for merchant acceptance.

78.     The Competitive Restraints enforced by Visa and Mastercard, and the actions taken in furtherance of these restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.     In 2006 and 2008, respectively, Mastercard and Visa each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of Visa and Mastercard.  But the IPOs did not change the essential character of their combinations, the setting of interchange, or the Competitive Restraints.  On the contrary, Visa

and Mastercard repeatedly reassured investors, employees, and members that the IPOs would not cause any significant change, other than with respect to antitrust liability, stating variously that the restructurings were being done in a way that would "ensure continuity of the core business operations," that existing contracts and rules would continue to govern their commercial relationships, that company operations would be "business as usual," and that the new governance structure would not change the way interchange rates are set.  Indeed, Mastercard made it clear to its issuing banks that it knew that "any new MasterCard needed to protect and even increase interchange to keep and attract Banks."

80.    The motivation for these IPOs was to limit the appearance that Visa and Mastercard were controlled by their member banks.  According to the prospectus for Mastercard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of Mastercard.  In particular, Mastercard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

81.    After the IPOs, neither Visa, Mastercard, nor any of the member banks took any affirmative action to withdraw from the respective combinations.  To the contrary, even after the IPOs, the member banks of Visa and Mastercard continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance.  Visa and Mastercard have continued to set "default" interchange fees for the benefit of their issuing bank members.  Thus, even after the IPOs, Visa's and Mastercard's members

maintained and enforced the Competitive Restraints, ensuring that they would not compete for merchant acceptance.

82.     After the IPOs, as before, Visa and Mastercard serve as facilitators and coordinators of horizontal agreements among their member banks to continue to enforce and adhere to "default" interchange fees and the Competitive Restraints.  It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints.  In the absence of agreements between issuing banks facilitated by Visa and Mastercard that assure supracompetitive interchange rates, issuing banks would compete for both merchant acceptance and cardholder issuances by differentiating their card offerings.  Visa and Mastercard, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks.  But for the arrangements facilitated by Visa and Mastercard, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

83.     Each issuing bank is an independently owned and independently managed business.  Each issuing bank is a separate economic actor pursuing separate economic interests.  In other aspects of their businesses, the member banks compete against one another.  For example, while their membership in Visa and Mastercard has caused individual banks to limit the terms upon which they compete for merchant acceptance, issuing banks compete with one another for cardholders by creating payment card products that offer rewards and other features that will make their payment cards more attractive than those offered by other issuing banks.  As found in *United States v. Visa USA, Inc.*, cardholders "can choose from thousands of different card products with

varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs."   163 F. Supp. 2d at 334.   These facts continue to be true today.

84.    Issuing banks do not compete for merchant acceptance of the cards they issue. Instead, both before and after the Visa and Mastercard IPOs, the member banks have ceded to Visa and Mastercard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue.  By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.  Such competition would not only decrease the cost of merchant acceptance, but would also decrease cardholder costs and/or increase the quality of card offerings available to cardholders.

85.    Further, Visa and Mastercard have engaged in coordinated and collusive conduct in order to preserve their respective unlawful combinations, particularly when threatened with challenges to the rules that support these unlawful combinations.  For example, when negotiating the now-rejected Class Action Settlement, Visa and Mastercard jointly negotiated and entered into a single agreement.  As a result, neither Defendant would agree to the modification of its anti-surcharge rules in a manner that would generate competition for merchant acceptance by issuing banks.  Likewise, in 2010, in negotiating a settlement with the Department of Justice by which the Visa and Mastercard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed, Visa and Mastercard insisted upon joint negotiations with the Department of Justice, in order to avoid the modification of either

Defendant's anti-discounting rules in a manner that would generate competition for merchant acceptance by issuing banks.

## THE RELEVANT PRODUCT MARKETS

86.    The relevant product markets are the market for merchant acceptance of general purpose credit (including charge) cards and the market for merchant acceptance of debit (including prepaid) cards.  Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.  These markets are each part of two-sided platforms in which issuing banks are competing, respectively, for credit card issuance and to gain depository accounts.  The market for merchant acceptance of general purpose credit cards and the market for merchant acceptance of debit cards are in themselves relevant markets even if the effects from the other side of the platforms (competition for credit card issuance and to gain depository accounts) are considered.  Alternatively, because merchant acceptance and card issuance occur on each side of a two-sided platform, the relevant markets in this case are the market for merchant acceptance and cardholder use of general purpose credit (including charge) cards and the market for merchant acceptance and cardholder use of debit (including prepaid) cards.

87.    Visa and Mastercard do not themselves issue cards (credit or debit), and do not have direct relationships with cardholders.  Accordingly, Visa and Mastercard do not operate to set prices based upon considerations of merchant and cardholder demand.  Instead, they facilitate an agreement among issuing banks to limit competition for merchant acceptance and to fix the fees charged to merchants.  The Competitive Restraints described herein impede the ability of merchants to substitute one issuing bank's cards for another's cards.

88.    Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants,

although this competition for card issuances is constrained by the Competitive Restraints and the "default" interchange set by Visa and Mastercard. This competition occurs in the markets for the issuance of credit and debit cards. Absent the Competitive Restraints, banks issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers, thus enhancing the value of these cards to cardholders. As a result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

89.     Merchant acceptance of general purpose credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other form of tender. Credit cards give cardholders the ability to access a line of credit, defer payment, and other features that are not available through debit cards or other forms of tender. For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards without losing sales, even in the face of high or increasing interchange fees. Visa and Mastercard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

90.     Alternatively, merchant acceptance and cardholder issuance of general purpose credit cards together is a relevant product market, with merchants and credit cardholders the customers on either side of the two-sided platform in which this market operates. For both cardholders and merchants, a credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or desire other features offered by credit cards, and therefore debit cards are not a substitute for cardholders in this market. Because debit cards are not a substitute for credit cards on the cardholder side of this platform, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, or

substitute debit card acceptance for credit card acceptance without losing sales, even in the face of high or increasing interchange fees. Visa and Mastercard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

91.     Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways. Debit cards must be tied to a bank account, or be pre-paid, unlike credit cards. When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Thus, merchants cannot discontinue acceptance of debit cards.

92.     Alternatively, merchant acceptance and cardholder issuance of general purpose debit cards together is a relevant product market, with merchants and debit cardholders the customers on either side of the two-sided platform in which this market operates. For both cardholders and merchants, a debit card is not interchangeable with a credit card or other form of tender. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Because credit cards are not a substitute for debit cards on the cardholder side of this platform, Plaintiffs and other merchants cannot discontinue acceptance of debit cards, or substitute credit card acceptance for debit card acceptance

without losing sales, even in the face of high or increasing interchange fees. Visa and Mastercard and their debit card issuing members are not constrained in the charges they impose for merchant acceptance of debit cards by the availability of credit cards and other forms of tender as payment options.

93. Debit cards are also regulated separately and differently from credit cards. In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks. The legislation did not mandate that the Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

94. Visa, Mastercard, and their debit card issuing members are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

95. The relevant geographic market for each product market is the United States and its territories.

96. The default interchange fees are set by Visa and Mastercard, respectively, on a national basis. Similarly, the Competitive Restraints are specific to the United States and its territories.

97. Plaintiffs, along with many other merchants, operate throughout the United States. The Competitive Restraints imposed on them require that they accept all cards of all issuing banks that are members of Visa or of Mastercard throughout the United States.

98. Visa and Mastercard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## THE COMPETITIVE RESTRAINTS

99.    On behalf of the issuing banks that are their members, Visa and Mastercard each have adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiffs that eliminate competition.    These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants.    As a result, the Competitive Restraints cause Plaintiffs' costs of acceptance to be higher than would prevail in competitive markets, and cause merchant acceptance to be lower.    The higher cost of acceptance is not offset by cardholder benefits that would not be available in the absence of these higher costs. For example, cardholder rewards such as cash back or airline miles could be readily funded by the other revenue issuing banks gain from the use of payment cards if interchange fees to merchants were reduced to a competitive level.    Further, cardholders would benefit from the elimination of the Competitive Restraints because the elimination of those rules and practices, in addition to reducing interchange fees to merchants, would increase competition among issuing banks for card issuances, and lead to lower fees or interest rates, or other benefits, such as more innovative products, for cardholders.

100.    Collective Setting of Interchange:    Visa and Mastercard set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks.    The setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

101.    Visa and Mastercard each have established complex "default" interchange fee schedules.    Default interchange includes not just the fee levels but also the structure of the fees, including the setting of performance thresholds or tiers and interchange fee categories.    In setting the interchange fees that are paid to their member banks, Visa and Mastercard each act as the

manager of its respective combination, setting the price that merchants pay for card acceptance. Interchange fees account for the largest portion of merchant costs for accepting such cards.

102.    Interchange fees are not set to recover Visa's or Mastercard's costs of providing network services.  Interchange is a fee that Visa and Mastercard, respectively, acting in combination with the issuing banks, require merchants to pay to the issuing banks.

103.    Visa purports to set non-binding "default" interchange fees.  Visa Core Principle No. 9.1.1.3 provides that "Interchange Reimbursement Fees are determined by Visa and provided on Visa's published fee schedule, or may be customized where Members have set their own financial terms for the Interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."

104.    Contrary to Visa's representations, "default" interchange rates set the prices all issuing banks charge merchants accepting their cards.  Because of the Competitive Restraints, bilateral negotiations between a merchant, or group of merchants, and an issuer simply do not occur. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

105.    Both before and after its IPO, Visa has corrupted the process of setting its purportedly default interchange fees by acting to maximize revenue for its unlawful combination of issuing banks, thereby preventing competition among issuing banks from reducing those fees. The interests of issuing banks have been Visa's paramount concern during the period of time relevant to the Complaint. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

106.    The process by which "default" interchange fees are determined by Visa is not intended to, and does not, maintain pricing equilibrium in a two-sided platform between cardholders and merchants.  Instead, "default" interchange rates are set by Visa with the objective of maximizing profits among its issuing banks.  Visa admits that it earns revenue only if issuing banks make a profit, and has framed its setting of "default" interchange based solely on creating financial incentives to increase issuing banks' revenues.  Specifically, Visa sets "default" interchange fees at a level that seeks to avoid the exit of issuing banks from the illegal combination and competing with the networks, rather than to address merchant and cardholder demand.  Further, in setting "default" interchange fees, Visa has sought to transfer costs to merchants, such as the risk of cardholder default, that in a competitive market would not be borne by merchants.

107.    In determining the performance thresholds, merchant categories and structure of fees that are applied to a merchant, Visa has acted on behalf of the members of its unlawful combination, permitting individual issuing banks and groups of issuing banks avenues to collude

to ensure that merchants do not gain more advantageous interchange fees by being placed into a lower-cost tier.

108.    Mastercard also purports to set non-binding "default" interchange fees. Mastercard Rule 8.3 provides that "[a] transaction settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. The Corporation has the right to establish default interchange fees and default service fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Customers in place. . . . Unless an applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

109.    Contrary to Mastercard's representations, "default" interchange rates set the prices all issuing banks charge merchants accepting their cards. Because of the Competitive Restraints, bilateral negotiations between a merchant, or group of merchants, and an issuer simply do not occur. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

110.    Both before and after its IPO, Mastercard has corrupted the process of setting its purportedly default interchange fees by acting to maximize revenue for its unlawful combination of issuing banks, thereby preventing competition among issuing banks from reducing those fees. The interests of issuing banks have been Mastercard's paramount concern during the period of time relevant to the Complaint.

111.    The process by which "default" interchange fees are determined by Mastercard is not intended to, and does not, maintain pricing equilibrium in a two-sided platform between cardholders and merchants.  Instead, "default" interchange rates are set by Mastercard with the objective of maximizing revenue for issuing banks.  Specifically, Mastercard sets "default" interchange fees at a level that seeks to avoid the exit of issuing banks from the illegal combination and competing with the networks, rather than to create equilibrium between cardholders and merchants.  Further, in setting "default" interchange fees, Mastercard has sought to transfer costs to merchants, such as the risk of cardholder default, that in a competitive market would not be borne by merchants.

112.    In determining the performance thresholds, merchant categories and structure of fees that are applied to a merchant, Mastercard has acted on behalf of the members of its unlawful combination, permitting individual issuing banks and groups of issuing banks avenues to collude to ensure that merchants do not gain more advantageous interchange fees by being placed in a lower-cost tier.

113.    Visa and Mastercard have, by the setting of "default" interchange fees and the Competitive Restraints, prevented merchants, acquiring banks, and processors from negotiating interchange and other fees by removing economic incentives for such negotiations and any leverage they might have with issuing banks.  Without the presence of "default" interchange rates, merchants would have sufficient leverage to negotiate or otherwise attain competitive interchange and other fees with issuing banks. Further, without the presence of "default" interchange rates, acquiring banks and processors would have an economic incentive to serve as a channel through which merchants could reduce their costs of acceptance.  In such competitive markets for merchant acceptance, acquiring banks and/or processors would act as agents for merchants by seeking to

lower merchants' cost of acceptance, including interchange fees, in competing with other acquiring banks and processors for merchant contracts.  Under the current Competitive Restraints, acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and Mastercard.  Both Visa's and Mastercard's rules, as quoted above, fix interchange, because the other Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.  Thus, acquiring banks and processors, under current rules, act as enforcers of Visa's and Mastercard's Competitive Restraints rather than as agents for merchants in gaining lower interchange and other fees.

114.    "Default" interchange fees do not benefit cardholders.  Without an agreement to eliminate price competition between issuing banks on the merchants' cost of acceptance, individual issuing banks would nevertheless have incentive to differentiate their products and fund rewards or other features of equal or greater benefit to cardholders, given the significant revenue issuing banks earn from card issuances and the loans generated by those cards.  In the absence of such a system, issuing banks would increase competition for card issuances through innovative products and card features.

115.    Absent the Competitive Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance.  In the cartelized markets created by the Visa and Mastercard combinations, Visa and Mastercard, acting for their member banks, establish interchange fee schedules for their member banks.  Plaintiffs are among the merchants injured by this collective setting of interchange fees by Visa and Mastercard.

116.    Honor All Cards Rules:  These rules require in relevant part that a merchant that accepts any Visa-branded or Mastercard-branded credit card must accept all Visa-branded or Mastercard-branded credit cards, no matter which bank issued the card or the card type.  Similarly, a merchant that accepts Visa-branded or Mastercard-branded debit cards, must accept all Visa-branded or Mastercard-branded debit cards, no matter the issuing bank.  Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank.  Thus, Plaintiffs are precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the credit or debit cards of any issuing bank that is a member of Visa or Mastercard.  As a result, the "default" interchange fees and network fees become binding on Plaintiffs.

117.    In addition, these Honor All Cards Rules require that a merchant that accepts any Visa-branded or Mastercard-branded credit card must accept all Visa-branded or Mastercard-branded credit cards, regardless of the rate of interchange or network fees charged on the card.  Thus, the rules require merchants, as a condition of accepting any Visa-branded or Mastercard-branded credit cards, to accept higher-cost cards such as rewards cards or commercial cards.  This requirement, as shown by issuing banks' conversion of non-rewards cards to reward cards, not

-47-

only shifts the cost of rewards from issuing banks to merchants, but also allows issuing banks to gain supracompetitive profits on such cards by receiving revenue that exceeds the cost of rewards and preventing competition for cardholder acceptance. As a result, the "default" interchange and network fees not only become binding on Plaintiffs, but Plaintiffs are obligated to pay higher fees for cards they might otherwise choose not to take as a condition of accepting any Visa-branded or Mastercard-branded credit cards.

118.    All Outlets Rules:   The All Outlets Rules are rules, policies or contractual provisions that require merchants who accept Visa-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location (for example, by region of the country). These rules also prevent cardholders from receiving the benefit of innovative approaches to payments that merchants may want to test at individual locations before implementing company-wide.

119.    Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded payment cards to accept those cards at all of their banners. This precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner. As a result, Plaintiffs could not indicate they would terminate acceptance of the cards of a particular issuing bank at some of their banners in order to promote competition as to fees.

120.    Changes that Visa implemented with respect to its All Outlets Rules after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiffs continue to suffer. The All Outlets Rules still require that if a merchant elects to accept Visa-branded cards at one of

its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer. Merchants also cannot accept the cards of some issuing banks but not others at a particular location. Moreover, the January 27, 2013 rules changes were implemented in compliance with the MDL 1720 Class Action Settlement. Because that settlement has been overturned, Visa may try to rescind these rules changes.

121.    No Discount Rules: Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card. However, pursuant to a jointly negotiated settlement with the United States Department of Justice, as of July 20, 2011, Visa and Mastercard changed their rules to allow merchants to offer discounts to consumers in limited circumstances. These changes to the No Discount Rules have not significantly diminished the anticompetitive effects of the Competitive Restraints. While Visa and Mastercard now allow merchants more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks or, where such ability exists, have been deterred from doing so by the Competitive Restraints. A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

122.    Visa's and Mastercard's No Discount Rules harm cardholders by precluding them from receiving the benefit of incentives merchants would offer in order to induce cardholders to use a lower cost form of payment.

123.    No Surcharge Rules: The No Surcharge Rules prohibit Plaintiffs from surcharging transactions in which a consumer used a Visa-branded card or a Mastercard-branded card. These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank. Absent the rules, a merchant could

surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee. As of January 27, 2013, Visa and Mastercard, after negotiating jointly with class plaintiffs, altered their No Surcharge Rules to permit merchants to surcharge credit card customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes implemented after January 27, 2013 with respect to the No Surcharge Rules for credit cards do not eliminate their anticompetitive effects or the injuries Plaintiffs continue to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer. Moreover, the January 27, 2013 rules changes were implemented in compliance with the MDL 1720 Class Action Settlement. Because that settlement has been overturned, Visa and Mastercard may try to rescind these rules changes.

124.    Anti-Discrimination Rules: The Anti-Discrimination Rules prohibit merchants from taking actions that might favor the use of one type or category of credit card or debit card, or one issuing bank's card, over another credit card or debit card.

125.    Visa's and Mastercard's Anti-Discrimination Rules harm cardholders by precluding them from receiving the benefit of merchant strategies that reward cardholders for using a lower cost form of payment.

126.    No Competing Marks Rules: The No Competing Marks Rules prohibit the use of competitive marks on Visa-branded or Mastercard-branded cards. These rules prevent the issuance of cards on which a merchant might reduce its cost of acceptance by routing a transaction to the general purpose payment network with the lower cost of acceptance. Visa and Mastercard revised their rules to allow multiple PIN debit marks on cards to comply with the Durbin Amendment and its implementing regulations. The No Competing Marks Rules eliminate a merchant's ability to

utilize legitimate efforts to incentivize cardholders to use the lowest cost form of payment available, thereby depriving the merchant of a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank.

127.    Visa's and Mastercard's No Competing Marks Rules harm cardholders by precluding them from receiving the benefit of merchant strategies that incentivize cardholders to use a lower cost form of payment.

128.    No Bypass Rule:  Visa's No Bypass Rule prohibits issuing banks and acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards.  This rule prevents an issuing bank and an acquiring bank from competing for merchant acceptance through lower acceptance costs by directly routing transactions between the two banks and bypassing the VisaNet system.  In combination with other Competitive Restraints, this rule prevents merchants from seeking to lower their cost of acceptance by steering customers to use payment cards in which the issuing bank and the acquiring bank are the same or have entered into an agreement to route transactions directly between the banks, without using the VisaNet system.

129.    The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance.  In the absence of these rules, the market for merchant acceptance would be competitive.  Alternatively, in the absence of the rules, both the merchant acceptance side of the payments platform and the card issuance side of the payments platform would become more competitive.  Plaintiffs and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiffs would accept an issuing bank's cards, including the amount of interchange fees — if any — Plaintiffs would pay on transactions involving an issuing bank's cards.  Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiffs and allow them to enhance the value their

customers receive.  Further, as described above, in the absence of the Competitive Restraints, issuing banks would compete more vigorously and on broader terms for cardholder issuances, resulting in equal or greater benefit to cardholders than exists under the Competitive Restraints.

130.    The Honor All Cards Rules, the No Discount Rules, the No Surcharge Rules, the Anti-Discrimination Rules, the All Outlets Rules, the No Competing Marks Rules, and the No Bypass Rule, individually and in combination, eliminate the incentives for Visa and Mastercard, and their issuing banks, to compete for merchant acceptance through setting lower "default" interchange fees, and do not provide cardholders benefits that would be available in the absence of these restraints.

131.    In addition to the Competitive Restraints, a variety of other rules, regulations (often not publicly disclosed), and rules "interpretations" enforced by Visa and Mastercard and their member banks also operate to support the anticompetitive effects of the Competitive Restraints and the imposition of "default" interchange fees on Plaintiffs.

132.    The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-generating objectives of the Visa and Mastercard combinations.  Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## **MARKET POWER**

133.    Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States and its territories.

134.    In 2001, in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market

for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States.  In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market.  Visa's share of the credit card market has not changed significantly since these two holdings; its 2016 share of the United States credit card purchase volume is greater than 48%.  The prior judicial findings of market power demonstrate that Visa has market power in the general purpose credit card market.

135.    The two-sided nature of the payments platform increases both Visa's and Mastercard's market power with respect to cost of acceptance for merchants.  Because of the two-sided nature of the platform, combined with Visa's and Mastercard's Competitive Restraints, cardholders who choose the form of payment to tender have had no visibility to the cost to merchants of that form of payment.  Visa's and Mastercard's Competitive Restraints have prevented merchants from educating cardholders as to such costs and severely limit merchants' ability to incentivize cardholders to use a lower cost form of payment.  These circumstances have reinforced and enhanced Visa's and Mastercard's market power.

136.    There are significant barriers to entry into the market for general purpose credit cards.  Indeed, the court in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general purpose credit card market.  Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion.  Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing general purpose credit card business.

137.    The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985.  Discover has never achieved more than a 7% share of the general purpose credit card market and its current share is approximately 5%.

138.    Visa's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by Visa on behalf of its issuing banks.  Visa also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would compete as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

139.    Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting Visa credit cards.  Further, Visa's market power is demonstrated by its ability to increase network fees and discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

140.    Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

141.    Competition with Mastercard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general purpose credit cards.  During the period that Visa and Mastercard were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and Mastercard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and Mastercard and among the members of both combinations.

142.    Within the market for merchant acceptance of credit cards, Visa-branded credit cards and Mastercard-branded credit cards do not constrain one another in competition for merchant acceptance.  Merchants have no meaningful alternative to accepting both Visa and Mastercard because Visa's and Mastercard's anticompetitive rules prevent merchants from influencing cardholders' choice of payment method.

143.    Mastercard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States.

144.    In *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that Mastercard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services.  In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that Mastercard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of Mastercard's market power.  Mastercard's share of the credit card market has not changed significantly since those decisions.

145.    Mastercard's conduct is direct evidence of its market power and that of its issuing banks.  Interchange fees are set by Mastercard on behalf of its issuing banks.  Mastercard also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Mastercard's credit card issuing banks would compete as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

146.    Mastercard's "default" credit interchange fees demonstrate Mastercard's market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting Mastercard credit cards.  Further, Mastercard's market power is demonstrated by its ability to increase network fees and discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

147.    Competition with Visa does not eliminate Mastercard's exercise of market power in the market for merchant acceptance of general purpose credit cards either.  During the period that Visa and Mastercard were joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and Mastercard's membership, rules, and most importantly power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and Mastercard and among the members of both combinations.

148.    As alleged above, there are significant barriers to entry into the market for the provision of general purpose payment card network services to merchants.

149.    The debit card market is dominated by Visa and Mastercard.  Combined, Visa and Mastercard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today.  Only Visa, Mastercard, and Discover allow signature authorization of debit transactions.

150.    Visa, jointly with its issuing banks, and Mastercard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

151.    Visa and its issuing banks jointly have market power in the market for acceptance of debit cards.  Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards.  This combination of issuing banks together with the Competitive Restraints gives Visa market power.  Visa has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

152.    Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost.  Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

153.    As with credit cards, within the market for merchant acceptance of debit cards, Visa-branded debit cards and Mastercard-branded debit cards do not constrain one another in competition for merchant acceptance.  Merchants have no meaningful alternative to accepting both Visa and Mastercard debit cards because Visa's and Mastercard's anticompetitive rules prevent merchants from influencing cardholders' choice of payment method.

154.    Despite provisions in the Durbin Amendment and the Federal Reserve Board's implementing regulations that provide merchants with routing options for debit card transactions (attempting to promote competition between different debit networks), Visa and Mastercard have taken affirmative steps, including but not limited to the imposition of the Fixed Acquirer Network Fee ("FANF") and other fees and rules/policies (including but not limited to implementation of the Transaction Integrity Fee and the elimination of credit vouchers), to circumvent competition between debit networks, and thereby have prevented their respective brands of debit cards from constraining one another in the market for merchant acceptance.

155.    Mastercard and its issuing banks jointly have market power in the market for acceptance of debit cards.  Mastercard participates in and manages a combination comprised of a significant fraction of all issuing banks of debit cards, such that merchants are unable to refuse to accept Mastercard-branded debit cards.  This combination of issuing banks together with the Competitive Restraints gives Mastercard market power.  Mastercard has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

156.    Mastercard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Mastercard debit cards as a condition of accepting Mastercard credit cards was dropped in 2003, few or no merchants stopped accepting Mastercard debit cards despite the availability of lower-cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that Mastercard's debit interchange rates were significantly above cost.  Because of Mastercard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

157.    Visa and Mastercard use their market power to impose supracompetitive "default" interchange fees and the Competitive Restraints on Plaintiffs.

158.    The Competitive Restraints and "default" interchange make it impossible for Plaintiffs to gain the benefits of competition as to the terms of acceptance, including lower interchange fees, with individual issuing banks.  The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance.  Absent the supracompetitive "default" interchange fees and the other Competitive Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level.  The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level of or rise in effective interchange fees being paid by merchants.  Since 2004, Plaintiffs' total interchange fees paid on transactions utilizing cards issued by members of Visa and Mastercard have risen faster than the rate of increase in retail sales.

159.    Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output by increasing merchant costs (which leads to higher prices and/or the loss of consumer welfare for customers), reducing merchant acceptance, and constraining innovation.  If issuing banks competed with each other on both sides of the platform, rather than eliminating competition through their agreement to the Competitive Restraints and "default" interchange, merchants would benefit from lower acceptance costs, which would be used by merchants to compete for consumers, and issuing banks would compete vigorously with each other for cardholder issuance and usage,

which would increase consumer welfare.  If issuing banks competed on both sides of the platform, consumers would benefit on both sides of the platform.

160.    Each Plaintiff has been harmed by the actions of the Visa and Mastercard combinations.  The amounts of interchange and network fees paid by each Plaintiff are supracompetitive.  The high interchange and network fees levied on Plaintiffs lead to increased merchandise prices for consumers or otherwise diminish the value their customers receive.  Thus, consumers, as well as merchants such as Plaintiffs, are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

161.    But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees.  Each Plaintiff would have the opportunity to use the strategies it uses in other parts of its business to obtain competitive acceptance terms.  As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiffs' businesses and they have no ability to gain lower costs in a competitive market.

162.    From 2004 to the present, Target has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Target has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

163.    From 2004 to the present, Macy's has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Macy's has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

164.    From 2004 to the present, TJX has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, TJX has been forced to abide by Visa's and Mastercard's

unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

165.    From 2004 to the present, Kohl's has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Kohl's has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

166.    From 2004 to the present, Staples has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Staples has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

167.    From 2004 to the present, JCPenney has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, JCPenney has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

168.    From 2004 to the present, Office Depot has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Office Depot has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

169.    From 2004 to the present, BBW has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, BBW has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

a.    From 2004 to the present, Victoria's Secret has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, Victoria's Secret has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

170.    From 2004 to the present, OfficeMax has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, OfficeMax has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

171.    From 2004 to the present, Big Lots has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, Big Lots has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

172.    From 2004 to the present, Abercrombie & Fitch has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, Abercrombie & Fitch has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

173.    From 2004 to the present, Ascena has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, Ascena has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

a.    From 2004 to the present, Maurices has accepted Visa-branded and Mastercard-branded credit and debit cards. Accordingly, Maurices has been forced to abide by

Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

174.    From 2004 to the present, Saks has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Saks has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

175.    From 2004 to the present, Lord & Taylor has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Lord & Taylor has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

176.    [RESERVED.]

177.    From 2004 to the present, Chico's has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Chico's has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

178.    From 2004 to the present, Luxottica has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, Luxottica has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

179.    From 2004 to the present, American Signature has accepted Visa-branded and Mastercard-branded credit and debit cards.  Accordingly, American Signature has been forced to abide by Visa's and Mastercard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange and network fees, all to its detriment.

## CLAIMS FOR RELIEF

### Count 1:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Credit Cards

180.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 179 as if fully rewritten herein.

181.    The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

182.    Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

183.    Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

184.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.

In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

185. Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

186. As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

187. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

188. Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rules have the effect of fixing the price of acceptance paid by merchants. But

for the Honor All Cards Rules, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

189.    Visa's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Visa-branded credit cards, regardless of the cost of acceptance for different categories of such cards. Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards on an all-or-nothing basis, regardless of whether the card is a basic card, a rewards card, or a commercial card. Each type of card, however, is a separate product with different costs to merchants. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards. By unlawfully forcing merchants to accept Visa-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants. But for the Honor All Cards Rules' requirement that merchants accept all types of Visa-branded credit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

190.    Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees and interchange paid to particular issuing banks. This further eliminates merchant acceptance as one of the areas of competition among issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations,

to offering benefits to consumers tendering certain card types of certain issuing banks, to lower their costs of acceptance. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards, without reducing the benefits cardholders now receive.

191.    Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive interchange fees are and have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for Visa-branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for merchant acceptance by lowering the cost of acceptance of the cards for each issuer.

192.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

## Count 2:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Debit Cards

193.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 192 as if fully rewritten herein.

194.    The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

195.    Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of

Section 1 of the Sherman Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

196.   Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange. Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

197.   In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

198.   Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

199.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

200.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded debit cards, in violation of Section 1 of the Sherman Act.

201.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among, based upon competition among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rules have the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rules, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

202.    Visa's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Visa-branded debit cards, regardless of the cost of acceptance for different categories of such cards.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards on an all-or-nothing basis, regardless of whether the card

is a consumer card or a commercial card. Each type of card, however, is a separate product with different costs to merchants. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards. By unlawfully forcing merchants to accept the Visa-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants. But for the Honor All Cards Rules' requirement that merchants accept all types of Visa-branded debit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

203.    Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees and interchange paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks to lower their costs of acceptance. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards, without reducing the benefits cardholders now receive.

204.    Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive interchange fees are and have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for Visa-branded

debit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for merchant acceptance by lowering the cost of acceptance of the cards for each issuer.

205.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of "default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition of supracompetitive debit interchange fees may be reduced by the regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance.  Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supracompetitive interchange fees on Visa debit card transactions.

206.    Visa's attempts to circumvent the effects of the Durbin Amendment and the regulations implementing that statute through the imposition of the FANF, together with other fees and restrictions (including but not limited to the implementation of the Transaction Integrity Fee and the elimination of credit vouchers) further raised Plaintiffs' costs of acceptance for Visa debit transactions through the anticompetitive elimination of lower-cost options that otherwise would have been available to merchants.

207.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

### Count 3:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Mastercard's Competitive Restraints Governing Credit Cards

208.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 207 as if fully rewritten herein.

209.     The use of credit cards issued by members of Mastercard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

210.     Mastercard and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Mastercard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Mastercard's Competitive Restraints, as defined above, constitute horizontal agreements among Mastercard and its members both prior to and after Mastercard's IPO.  Mastercard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Mastercard members.  Accordingly, by these arrangements, Mastercard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Mastercard, similarly not to compete.

211.     Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

212.     In addition, Mastercard's rules and related contracts entered into before the Mastercard IPO constituted a horizontal agreement from which Mastercard and the member banks

have never withdrawn.  In changing its ownership structure at the time of the IPO, Mastercard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

213.    Alternatively, after the Mastercard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

214.    As alleged above, Mastercard and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

215.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Mastercard-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Mastercard-branded credit cards, in violation of Section 1 of the Sherman Act.

216.    Mastercard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Mastercard affords merchants no choice but to accept Mastercard-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Mastercard-branded cards of all issuing banks, the Honor All Cards Rules have the effect of fixing the price

of acceptance paid by merchants. But for the Honor All Cards Rules, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

217.    Mastercard's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Mastercard-branded credit cards, regardless of the cost of acceptance for different categories of such cards. Under the Honor All Cards Rules, Mastercard affords merchants no choice but to accept Mastercard-branded cards on an all-or-nothing basis, regardless of whether the card is a basic card, a rewards card, or a commercial card. Each type of card, however, is a separate product with different costs to merchants. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards. By unlawfully forcing merchants to accept Mastercard-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants. But for the Honor All Cards Rules' requirement that merchants accept all types of Mastercard-branded credit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

218.    Mastercard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees and interchange paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations,

to offering benefits to consumers tendering certain card types of certain issuing banks to lower their costs of acceptance. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards, without reducing the benefits cardholders now receive.

219.    Mastercard's setting of "default" interchange fees for the acceptance of Mastercard-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market. Instead, Mastercard's supracompetitive interchange fees are and have been set collectively by Mastercard in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for Mastercard-branded credit cards by Mastercard and the other Competitive Restraints managed by Mastercard, issuing banks would compete for merchant acceptance by lowering the cost of acceptance of the cards for each issuer.

220.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Mastercard's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

**Count 4:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Mastercard's Competitive Restraints Governing Debit Cards**

221.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 220 as if fully rewritten herein.

222.    The use of debit cards issued by members of Mastercard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

223.    Mastercard and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Mastercard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Mastercard's Competitive Restraints, as defined above, constitute horizontal agreements among Mastercard and its members both prior to and after Mastercard's IPO.  Mastercard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing debit cards agreed to by Mastercard members.  Accordingly, by these arrangements, Mastercard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Mastercard, similarly not to compete.

224.    Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

225.    In addition, Mastercard's rules and related contracts entered into before the Mastercard IPO constituted a horizontal agreement from which Mastercard and the member banks have never withdrawn.  In changing its ownership structure at the time of the IPO, Mastercard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor

did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

226.    Alternatively, after the Mastercard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

227.    As alleged above, Mastercard and its members jointly have market power in the market for merchant acceptance of debit cards.

228.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Mastercard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Mastercard-branded debit cards, in violation of Section 1 of the Sherman Act.

229.    Mastercard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, Mastercard affords merchants no choice but to accept Mastercard-branded cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among, based upon competition among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Mastercard-branded cards of all issuing banks, the Honor All Cards Rules have the effect of fixing the prices of acceptance paid by merchants. But for the Honor All Cards Rules, competition among issuing banks for acceptance by merchants would lower the cost of acceptance. The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

230.    Mastercard's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Mastercard-branded debit cards regardless of the cost of acceptance for different categories of such cards.  Under the Honor All Cards Rules, Mastercard affords merchants no choice but to accept Mastercard-branded cards on an all-or-nothing basis, regardless of whether the card is a consumer card or a commercial card.  Each type of card, however, is a separate product with different costs to merchants.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards.  By unlawfully forcing merchants to accept Mastercard-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants.  But for the Honor All Cards Rules' requirement that merchants accept all types of Mastercard-branded debit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

231.    Mastercard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees and interchange paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks to lower their costs of acceptance.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards, without depriving cardholders of benefits they now receive.

232.    Mastercard's setting of default interchange fees for the acceptance of Mastercard-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, Mastercard's supracompetitive interchange fees are and have been set collectively by Mastercard in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for Mastercard-branded debit cards by Mastercard and the other Competitive Restraints managed by Mastercard, issuing banks would compete for merchant acceptance by lowering the cost of acceptance of the cards for each issuer.

233.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Mastercard's setting of "default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition of supracompetitive debit interchange fees may be reduced by the regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance.  Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supracompetitive interchange fees on Mastercard debit card transactions.

234.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Mastercard's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

-79-

A.    Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages for past and future injury, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    A declaration that the setting of default interchange and the Honor All Cards Rules, No Discount Rules, No Surcharge Rules, Anti-Discrimination Rules, No Competing Marks Rules, No Bypass Rules, and All Outlets policies and contractual restraints are anticompetitive and a violation of Section 1 of the Sherman Act;

C.    Permanent injunctive and equitable relief sufficient to eliminate the anticompetitive effects of each Defendant's actions, including but not limited to:

1.    Enjoining any further enforcement of any rules, policies, and contractual provisions, and of any other activities by Defendants, that reduce, inhibit or prevent competition among issuing banks for merchant acceptance or facilitate the collective setting of merchant fees and charges, including but not limited to setting of "default" interchange fees, Honor All Cards Rules, No Discount Rules, No Surcharge Rules, Anti-Discrimination Rules, No Competing Marks Rules, No Bypass Rules, and All Outlets policies and contractual restraints, and of the adoption of any future rules, policies or contractual provisions with the same or similar anticompetitive effects;

2.    Enjoining Defendants from imposing any new fee or charge as a substitute for any fee or charge enjoined by the Court or for the purposes of evading remedies necessitated by the anticompetitive effects of their past and current rules, policies, contractual provisions, and other activities;

3.    Requiring Defendants to take affirmative action to facilitate competition for merchant acceptance, including competition in the negotiation of merchant fees and charges and in any other areas in which Defendants' rules have prevented competition;

4.    Requiring Defendants to cooperate in any modification of point of sale systems, mobile payment systems, authorization, clearing and settlement routing, or other technology to the extent necessary to generate competition for merchant acceptance and competition between issuing banks in the negotiation of merchant fees and charges;

5.    Prohibiting Defendants from taking any actions to impede merchants' access to clear and timely information, including at the point of sale, concerning the amount of fees and charges and the rules that will apply to each transaction, or impede merchants' communication of the amount of such fees and charges to cardholders at the time of the transaction;

6.    Prohibiting Defendants from communicating to any issuer the terms of any agreement between any other issuer and any merchant or facilitating the exchange of such information among issuing banks;

7.    Prohibiting Defendants from coordinating with each other with respect to any of the remedies related to their past anticompetitive conduct; and

8.    Exercising continuing jurisdiction over such injunctive and equitable relief, including, but not limited to, appointing a special master to oversee prompt compliance by Defendants with all terms of the Court's judgment.

D.    An award of the cost of the suit, including reasonable attorney's fees; and

E.    Such other and further relief as the Court deems just, equitable, and proper.

**VORYS, SATER, SEYMOUR AND PEASE LLP**

/s/ James A. Wilson
James A. Wilson
Robert N. Webner
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street

Columbus, Ohio 43215
(614) 464-6400
jawilson@vorys.com

**GIBBS & BRUNS LLP**
Kathy D. Patrick
Barrett Reasoner
Jorge M. Gutierrez, Jr.
Nick Beachy
Erica Krennerich
1100 Louisiana Street, Suite 5300
Houston, Texas 77002
(713) 650-8805
kpatrick@gibbsbruns.com

Dated: January 22, 2025          *Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

**VORYS, SATER, SEYMOUR AND PEASE LLP**

/s/ James A. Wilson
James A. Wilson
Robert N. Webner
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
jawilson@vorys.com

**GIBBS & BRUNS LLP**
Kathy D. Patrick
Barrett Reasoner
Jorge M. Gutierrez, Jr.
Nick Beachy
Erica Krennerich
1100 Louisiana Street, Suite 5300
Houston, Texas 77002
(713) 650-8805
kpatrick@gibbsbruns.com

Dated:  January 22, 2025                    *Attorneys for Plaintiffs*

-83-